2020 IL App (1st) 160514 & 162297-U

SIXTH DIVISION
January 17, 2020

Nos. 1-16-0514 &1-16-2297 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 20694 |
| | ) | |
| CELESTER EDWARDS, | ) | Honorable |
| | ) | Matthew E. Coghlan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CONNORS delivered the judgment of the court.
Justices Cunningham and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for armed habitual criminal and aggravated discharge of a firearm are affirmed over his contentions that the State misrepresented the forensic evidence in its rebuttal closing argument and the court incorrectly instructed the jury on the burden of proof for armed habitual criminal. The trial court did not abuse its discretion when it sentenced defendant. We affirm the trial court's summary dismissal of defendant's postconviction petition. We remand to the circuit court as to the fines and fees order.

¶ 2    Following a jury trial, defendant, Celester Edwards, was found guilty of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2014)) and of being an armed habitual

criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2014)). The court sentenced defendant to 25 years in prison for each offense, to be served concurrently. Defendant contends on appeal that (1) the State misrepresented the forensic evidence to the jury during its rebuttal closing argument; (2) he was denied a fair trial because the trial court gave the jury contradictory and confusing jury instructions about the State's burden of proof with respect to AHC; (3) his sentence was excessive; and (4) certain fines and fees were incorrectly imposed. In this consolidated appeal, defendant also appeals from the trial court's first stage summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.*) (West 2014)). We affirm.

¶ 3        Defendant's convictions arose from a shooting that took place during the early morning hours on October 26, 2012. At trial, the State proceeded on single counts of AHC and aggravated discharge of a firearm.

¶ 4        At the ensuring jury trial, Brandon Watkins testified that, at around midnight on October 26, 2012, he was in his bedroom watching television in his apartment located at 729 North Springfield Avenue. He heard a noise, so he walked to the front of his house. He noticed holes in the front window and kitchen and bathroom walls. The holes were not there before he heard the noise. He did not see anyone shoot into his window.

¶ 5        Chicago police detective John Korolis testified that, at around midnight on October 26, 2012, he and Chicago police detective John Gillespie were driving in an unmarked police car without headlights on. It was dark and the streetlights were on. As Korolis approached the area of 700 North Springfield, which he described as a residential block, he saw defendant, whom he identified in court, standing in the street holding a firearm and shooting into a building located at 729 North Springfield. Defendant shot the gun three or four times, after which he fled on foot

carrying the gun in his hand. Korolis pursued defendant in the police vehicle. Defendant fled northbound on Springfield and then westbound down an alley. Defendant was carrying a black handgun, which he was swinging with his right arm. At one point, defendant tossed the gun over his head and fell. Korolis stopped his vehicle and placed defendant into custody. Korolis never lost sight of defendant during the chase.

¶ 6 After defendant was placed into custody, Korolis saw defendant's handgun in the backyard of 738 North Springfield. Another officer arrived at the scene and stayed with the gun until the evidence technician arrived. Korolis then went to the residence located at 729 North Springfield, which was a two-unit building. There, he observed multiple bullet holes in the front window as well as in the kitchen and bathroom walls.

¶ 7 Chicago police detective John Gillespie testified that, on October 26, 2012, he was driving with Korolis in their squad car without the lights on when he observed defendant, whom he identified in court, shooting a handgun at a residential building located at 729 North Springfield Avenue. Defendant, who was wearing a black hooded sweatshirt, shot the gun three times. The street had artificial lighting and nothing obstructed Gillespie's view of defendant. Gillespie could not see the shooter's face.

¶ 8 Gillespie further stated that the officers pursued defendant in their vehicle. Defendant ran northbound and then turned into an alley that had artificial lighting. Gillespie did not have any difficulty seeing defendant. Gillespie testified that defendant "never turned around but kept going in the west alley of Springfield." Defendant had a handgun in his right hand, which he was swinging. Gillespie never lost sight of defendant and did not see anyone else on the street. When defendant reached a garage at 738 North Springfield, defendant "slipped on some *** gravel and

- 3 -

ended up tossing the gun." Gillespie did not know how defendant fell because the front of his car blocked his view. Gillespie thought defendant's gun fell to the ground, but Korolis told him defendant threw it over a fence.

¶ 9     The officers apprehended defendant and Gillespie saw the handgun lying "in plain view in the grass unobstructed" of the backyard of 738 North Springfield. Gillespie was present when the evidence technician recovered the gun. DNA testing was not performed on the gun because the Illinois State Police crime lab did not conduct DNA testing on these types of cases. Gillespie testified that the recovered handgun had six chambers and acknowledged that, when he testified at a preliminary hearing, he testified that the gun had seven chambers. The parties stipulated that the hooded sweatshirt defendant was wearing was not tested for gunshot residue.

¶ 10    Chicago police officer Avila testified that he recovered the gun in the backyard at 738 North Springfield.[1] He stayed with the gun until the evidence technician recovered it. Chicago police officer Carla Rodriguez, an evidence technician, testified that she recovered the handgun, which had six expended shell casings in it, in the backyard of 738 North Springfield.

¶ 11    Rodriguez also investigated the residence at 729 North Springfield. There, she saw two bullet holes in the front window and recovered one fired bullet from in between the screen and the windowpane. She found a bullet hole in the kitchen wall and followed a trail for that hole into the bathroom shower. She was unable to locate the bullet in the bathroom. At about 2 a.m. after the shooting, Rodriquez performed a gunshot residue (GSR) test on defendant's hands.

_____

[1] Officer Avila's first name is not in the record.

¶ 12    The State orally presented a stipulation between the parties that a forensic scientist would testify that the six recovered cartridge cases and fired metal bullet fragment recovered from the front window were fired from the recovered firearm.

¶ 13    Forensic scientist Scott Rochowicz testified that he performed analysis on the GSR test taken from defendant. When he analyzed the GSR evidence, he looked for the presence of antimony, barium, and lead. When these elements are identified within a single particle, it is considered a "tricomponent particle." There must be a minimum of three tricomponent particles to conclude that GSR is present. With respect to the sample taken from defendant's left hand, he found "less than three" tricomponent particles and concluded it was negative for the presence of GSR. With respect to the sample taken from defendant's right hand, he found four tricomponent particles and concluded that his right hand either discharged a firearm, handled a firearm, or was in close proximity to a firearm when it was discharged.

¶ 14    On cross-examination, Rochowicz acknowledged that antimony, barium, and lead are present in many places in the environment and the presence of all three elements did not mean that GSR was present. Rochowicz acknowledged that these elements can be found in items such as brake liners, air bags, or fireworks. Rochowicz testified that studies had shown that GSR particles could be found in police stations and police cars. It was possible for a person to have GSR on his hand if he shook hands with another person who had handled either a gun or an item that had GSR on it. Rochowicz recommended that GSR testing be completed within six hours after the person was suspected of having discharged a firearm.

¶ 15    Assistant state's attorney (ASA) Naheda Zayyad Hussien testified that she interviewed defendant at the police station the afternoon after the shooting. Gillespie and Korolis were present

and Hussien advised defendant of his rights. Defendant told her he understood his rights and agreed to speak. Hussien asked defendant why he "shot at the building" and defendant stated he "was ordered to do so by the Vice Lords because they were selling heroin out of that building." He stated that "he no longer runs with the Gangster Disciples," that he had "purchased the gun, which was a revolver, earlier in the day," and that his "intention was to bust out the window but instead he shot at the window." Defendant stated that he had smoked "some" marijuana but was not under the influence of any drugs or alcohol. Defendant did not want to put his statement in writing. Hussien's interview with defendant was not recorded and Hussein did not have him sign a form acknowledging that he understood his rights.

¶ 16    The court admitted into evidence certified copies of defendant's prior convictions from 2010 for aggravated domestic battery and from 1994 for home invasion, unlawful vehicle invasion, aggravated stalking, aggravated unlawful restraint, and aggravated battery. The court entered a stipulation between the parties that defendant had two qualifying convictions for AHC.

¶ 17    Defendant testified that in October 2012 he worked at Inter Tax Service and Terrance Manufacturing Company. At around midnight on October 26, 2012, defendant went to a "get together" at a coworker's house near Springfield Avenue and Hirsch Street, which was about four houses from where the shooting occurred. Defendant did not work that day and was wearing his work clothes that consisted of steel-toed boots, Adidas pants, and a white t-shirt. Defendant parked in a nearby alley because he could not find a parking spot.

¶ 18    As defendant was exiting a gangway, he heard gunshots. He did not look around to see where the shots came from. The gate he had exited from the gangway was locked so he ran behind a car on Springfield and then started "bear-crawling real low" until he turned into an alley. After

he made another turn, he started walking and then heard a car door open. Defendant turned around and the passenger in that car was pointing a gun at him. Defendant "cover[ed] up" because the car did not have lights on.

¶ 19    Defendant testified that the driver got out of the car and "[t]hey *** grabbed me by my collar," put handcuffs on him, grabbed him by the shirt, and threw him towards the car. Defendant fell on the car's back door, which "knocked the wind out" of him. Defendant testified that "[t]hey pushed me some more," hit him in the back of his head with an object, and then pushed him inside the car. Defendant lost consciousness and did not regain it until he was in the parking lot at the police station. Defendant testified that the person who placed handcuffs on him was one of the detectives who had previously testified but he could not remember which one.

¶ 20    Defendant testified that he injured his right leg when he was thrown towards the car. He asked the detectives at the police station for medical attention, but they refused to give it to him. He identified two photographs of his leg taken two hours after the incident and testified that they showed a scar and bruise on his leg. He denied that the photographs showed injuries that had occurred before the incident.

¶ 21    Defendant testified that he told Hussien he wanted medical attention and did not want to talk. He never told Hussien that the Vice Lords ordered him to shoot at the building, that he was ordered to do so because they were selling heroin out of that building, that he purchased the gun earlier that day, or that he only smoked marijuana. He never stated that he wanted to "bust out the window" but "shot at the window" instead. Defendant testified that he had asthma and could not run half a block without needing his asthma pump.

¶ 22     In the State's rebuttal, the parties stipulated that defendant had a prior conviction from April 7, 2010, for aggravated domestic battery. The State also called Hussien, Gillespie, and Chicago police officer Patrick McPartland. Hussien testified that defendant never told her that he did not want to talk and that he did not invoke his right to remain silent or ask for medical treatment. Gillespie testified that the area around the shooting was not congested and there were open parking spaces. He denied hitting defendant or pushing him into the car door. Gillespie did not notice, and defendant did not complain of, any injuries. Gillespie identified the black sweatshirt defendant was wearing on the night of the shooting. Gillespie testified that he was present for Hussien's conversation with defendant and defendant was forthcoming and cooperative. Defendant did not refuse to talk and never stated that he wanted to invoke his right to remain silent. Defendant did not tell Gillespie that he wanted to go to the hospital or complain that he was injured.

¶ 23     McPartland testified that he was a lockup keeper on the date of the shooting and observed defendant in the processing room at the police station. He did not observe any injuries or obvious trauma to defendant. Defendant did not tell him that he wanted to go to the hospital, that he was taking any medication, or that he had asthma.

¶ 24     In closing argument, defense counsel argued that defendant's version of the incident was credible and Gillespie and Korolis's versions were not credible. With respect to the GSR evidence, defense counsel told the jury that it "really doesn't show you much" or "add anything" to this case. She asserted that the jury heard Rochowicz testify that "transfer happens" and "transfer is such an issue that they have a time limit that they recommend for the GSR to be collected from the hands because *** it washes away quickly." She stated "so the fact that there were four particles and a tiny fraction of the width of a hair particle, four particles on one hand and one on the other *** he

was not able to tell you in fact that gunshot residue was on there because he shot a gun." Defense counsel further argued that GSR "could have gotten onto the hands a lot of different ways" and that GSR had been found in police stations and in the back of police cars.

¶ 25    In rebuttal, the State argued:

"The Defense says it is a non-issue because of transference and the only particles on one hand, four particles on one hand and one particle on the left. Where is the evidence of transference? Where is the evidence that anybody had fired a gun that was in the squad car where the Defendant was transferred?"

Defense counsel objected. The court overruled the objection and the State continued its argument:

"District 19 is so polluted with gunshot residue that everybody picks up trace evidence. There is none. They want you to believe or assume that because it is a police station, because it is a police car, that there is gunshot residue all over the place. Where is the evidence? The only evidence was the testimony that it was possible if there were gunshot residue around that it may get transferred, and if the Defendant had run from the police and not been caught for an hour later or he wasn't right there next to the gun when he was arrested, that may have some relevance, but where is the evidence? The Defendant was seen firing a gun. Does the gunshot residue get on the hand because he sat in the back of a police car or fired the gun? Because he fired the gun. The left hand could have been attributable to transfer when he is cuffed and his hands are together. Transference from a police car, and that is why he is positive for GSR? He is the unluckiest guy in the world. The credible evidence is and the reasonable inference from the evidence and your common sense tells you that he fired a gun, and that is why he had gunshot residue on his hand. ***

Remember what the Forensic Scientist told you? That within six hours you want to get that done because it can fall off when you move your hands and everything else. The gunshot residue was taken what, over two hours after the shooting? That could explain why it is only 4 to 1, not because of transference."

¶ 26    Following argument, the court read the instructions to the jury. Thereafter, outside the presence of the jury, the court explained to the parties that the AHC instruction on the burden of proof was incorrect and that it had corrected the error. Neither party objected. The electronic supplemental common law record shows that the written jury instructions stamped as filed by the clerk on March 25, 2015, contained the correct burden of proof instruction for AHC.

¶ 27    The jury found defendant guilty of aggravated discharge of a firearm and AHC. Defendant subsequently filed a motion for a new trial. The court denied defendant's motion for a new trial.

¶ 28    At sentencing, the court stated that it had a letter from Instant Tax Service indicating that defendant was good employee and always on time, an attendance sheet showing his attendance at "AA" meetings, and a document prepared by defendant showing "things he's grateful for." The State argued in aggravation that defendant had a criminal history since the 1990s and that his prior offenses were violent in nature. In mitigation, defense counsel argued that the court had documents about defendant's history and "problems" and that "[a]lcohol very recently has been designated as a mental illness." Defense counsel stated that defendant had professed his innocence, which was "very dangerous," and "he still did it and he went before a jury and admitted the things he had done. But not this." Counsel requested the minimum sentence of six years in prison. In allocution, defendant told the court that "I've been here in front of you for three years, and I respect your

courtroom. Even though you didn't *** grant my motion, I still have respect for you and your courtroom."

¶ 29    The court sentenced defendant to concurrent prison terms of 25 years for AHC and 25 years for aggravated discharge of a firearm and imposed $457 in mandatory fines and fees. In doing so, the court stated that it had the opportunity to review the PSI, defendant's background and his criminal, educational, employment, and family histories, including that he had a young son. The court stated that it considered the facts of the case and that the evidence in this case was strong. The court noted that defendant had a history of violent crimes and stated that "certainly [defendant's] criminal history is sufficient to warrant a severe punishment when taking into consideration the allegations that *** he's been found guilty of already." The court also stated that when defendant was in court, he "conducted himself like a gentleman, but there is another side to [defendant] when he's out on the streets, and I think he's demonstrated himself to be a danger."

¶ 30    On January 28, 2016, the court denied defendant's motion to reconsider his sentence, stating that it considered the mitigation evidence, defendant's background, and the nature of his conduct. On that same date, defendant filed a notice of appeal with the circuit court.

¶ 31    On February 29, 2016, defendant filed a *pro se* postconviction petition. On April 1, 2016, he filed an "amend[ed]" petition and "subamend[ed]" petition, in which he revised his claims and attached additional exhibits.[2] In defendant's postconviction petition, he alleged, as relevant here, that Gillespie committed "knowing, plus deliberate perjury." He stated that at the preliminary hearing, Gillespie testified that "[d]efendant was running turned on them with the [g]un and than

---

[2] The "amend[ed]" petition and "subamend[ed]" petition revised claims to the original petition and added additional supporting information. We will collectively refer to all petitions as defendant's postconviction petition.

[*sic*] threw it in a yard" and that at trial he testified that "[d]efendant was walking fast and tripped over something and he (did Not) see a Gun come out of his hand."

¶ 32 Defendant also alleged that trial counsel was ineffective for failing to call Leyla Garcia as a witness. He alleged that Garcia's testimony would have impeached Brandon Watkins's testimony. To support his petition, defendant attached an affidavit from Leyla Garcia, which stated:

"On Oct. 27, 2012 around 11:15 p.m. Me and some Friends was in the backyard on Springfield getting high off drugs and drinking they heard gunshot In front of the house they Ran in the house went to the kitchen and Seen a bulletholes in the kitchen wall Everyone Ran out the back through the alley the guy on the police Report stayed back he was high and the place was his boyfriend basement apartment he was Never sleep and Everyone WAS OUTSIDE when the shooting happened the guy on the police Report lied about his story Im Coming forward with the truth."

¶ 33 On June 24, 2016, the trial court summarily dismissed defendant's postconviction petition, finding that his claims were frivolous and patently without merit. Defendant appealed. We subsequently granted defendant's motion to consolidate his direct and postconviction petition appeals.

¶ 34 Defendant first contends that in the State's rebuttal closing argument, it misrepresented the forensic scientist's testimony about the GSR evidence. He argues that the prosecutor's argument that there was no evidence that GSR was transferred to defendant's hands in the police car or at the police station was factually wrong because the forensic scientist testified that transference can explain the presence of GSR on "innocent objects" and had been found in police stations and police

cars. Defendant claims the prosecutor's misstatements about the GSR evidence prejudiced him because it was the only forensic evidence presented and the case was closely balanced.

¶ 35    Initially, we note that defendant acknowledges that he did not preserve his challenge to the State's rebuttal closing argument about the GSR evidence because he did not raise the issue in his posttrial motion. See *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50 (to preserve an alleged error for review, a defendant must object at trial and raise the issue in a posttrial motion). Defendant asserts that we should review the issue for plain error. Under the plain error doctrine, we may review unpreserved error if "the evidence is so closely balanced that error alone threatened to tip the scales of justice against the defendant" or the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process,." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). However, we must first determine whether any error occurred at all. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 36    A prosecutor is allowed wide latitude during closing and rebuttal arguments. *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 38. "Arguments and statements that are based upon the facts in evidence, or upon reasonable inferences drawn there from [*sic*], are within the scope of closing argument." *Anaya*, 2017 IL App (1st) 150074, ¶ 62. When we review a challenge to a prosecutor's comments, we must consider the comments in the context of the entire closing arguments made by both parties. *People v. Gonzalez*, 388 Ill. App. 3d 566, 587 (2008). A prosecutor's comments are not improper if they were provoked or invited by defense counsel's argument. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 108. We will not reverse a jury's verdict based upon improper comments unless the comments resulted in "substantial prejudice" to defendant and "constituted a material factor" in the conviction. *Gonzalez,* 388 Ill. App. 3d at 587.

¶ 37 We apply an abuse of discretion standard when we review the propriety of a prosecutor's remarks in closing argument. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54; *People v. Cook,* 2018 IL App (1st) 142134, ¶ 64. However, we apply the *de novo* standard of review when we review whether a prosecutor's misconduct, or improper remarks during argument, were "so egregious" such that a new trial is warranted. *Cook*, 2018 IL App (1st) 142134, ¶ 64.

¶ 38 From our review of the entire closing arguments made by both parties, we find that the prosecutor's remarks made in rebuttal closing argument about the GSR evidence were supported by the evidence presented. Rochowicz, the forensic scientist, testified that it was "possible" that GSR transference could occur, as he testified that a person could get GSR particles on his hand from shaking hands with another person who had just shot a gun or from wiping his hands on a cloth that had GSR on it. He acknowledged that studies had shown that GSR particles "can be found" in police stations and that GSR particles "have been found" in police cars. However, Rochowicz did not testify that defendant's hand had GSR on it due to transference that night. Nor did he testify that there was GSR in the detectives' police car, at the police station, or on anything that defendant touched that night such that transference occurred. Accordingly, the prosecutor's comments relating to there being no evidence that transference occurred in this case or that there was GSR in the detectives' police car or at the police station did not contradict Rochowicz's testimony.

¶ 39 Further, the prosecutor's comments were a reasonable response to defense counsel's closing argument. Defense counsel expressly argued that the forensic scientist testified that "transfer happens" and "is such an issue that they have a time limit" for collecting GSR evidence because "it washes away quickly." Defense counsel asserted that "[the forensic scientist] was not

able to tell you in fact that gunshot residue was on there because he shot a gun," that GSR "could have gotten onto the hands a lot of different ways," and that GSR has been found in police stations and police cars. Thus, the prosecutor's comments about there being no evidence that there was GSR in the police car or at the police station or that transference had occurred in this case were made in response to defense counsel's closing argument. See *Anderson*, 2017 IL App (1st) 122640, ¶ 110 (the court concluded that the prosecutor's challenged comments were a reasonable response to defense counsel's arguments).

¶ 40    Defendant asserts that the State improperly asserted in rebuttal closing argument, "[w]here is the evidence?" He argues that the State shifted the burden of proof to defendant to present evidence that the GSR particles had been transferred to defendant. We are unpersuaded by defendant's argument.

¶ 41    As previously discussed, the record shows that defense counsel expressly argued in closing argument that the forensic scientist testified that "transfer happens," that GSR "could have gotten onto the hands a lot of different ways," and GSR had been found in police stations and police cars. Thus, in rebuttal, when the prosecutor responded by stating "[w]here is the evidence?" with respect to the issue of GSR transference, he did not shift the burden of proof to defendant to establish that there was GSR in the police car and at the police station. Rather, the prosecutor was arguing that there was no evidence to support defendant's theory that GSR particles innocently transferred to defendant's hand that night. See *People v. Glasper*, 234 Ill. 2d 173, 212 (2009) (where defense counsel argued that the defendant's confession was coerced and the State asked in rebuttal "[w]here's the evidence of that?" the reviewing court concluded that the State did not shift the

burden of proof, noting that the prosecutor "pointed out that no evidence existed" to support the defendant's theory).

¶ 42 Accordingly, we conclude that the prosecutor's comments about the GSR evidence made in rebuttal closing argument were not improper. No error occurred and so we will not review defendant's challenge for plain error.

¶ 43 Defendant argues in the alternative that his counsel was ineffective because he failed to preserve his challenge by raising the issue in a posttrial motion. To prove that counsel was ineffective, a defendant must show counsel's performance was deficient and he was prejudiced by the deficient performance. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 53. To prove counsel's performance was deficient, a defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms." *People v. Colon*, 225 Ill. 2d 125, 135 (2007). To prove prejudice, a defendant must show that, but for counsel's deficient performance, "there is a reasonable probability that the trial outcome would have been different." *Temple*, 2014 IL App (1st) 111653, ¶ 53. A defendant must satisfy both prongs. *Id.*

¶ 44 Defendant cannot establish prejudice. As previously discussed, the prosecutor's comments made in rebuttal were not improper. Because defendant's claim does not have merit, defendant cannot show that, had counsel raised his challenge to the prosecutor's comments in a posttrial motion, the result of the posttrial proceeding would have been different.

¶ 45 Defendant next contends that he was denied a fair trial because the trial court gave the jury contradictory and confusing jury instructions about the State's burden of proof for AHC. Defendant acknowledges he did not preserve the issue for review by objecting at trial or raising the issue in his posttrial motion. See *Anaya*, 2017 IL App (1st) 150074, ¶ 50 (to preserve a

challenge to an alleged error for review, a defendant must object at trial and raise the issue in a posttrial motion). Rather, citing *People v. Sprinkle*, 27 Ill. 2d 398, 400-03 (1963), he argues that, because it was the trial court's burden to provide correct instructions and the court created the error, he did not forfeit the issue by failing to object. Under *Sprinkle*, the rules of forfeiture are relaxed when the basis for the challenge is the trial court's conduct. *Sprinkle,* 27 Ill. 2d at 401. However, our supreme court has stated that relaxing the forfeiture rule is "warranted when the trial court has overstepped its authority in the presence of the jury or when counsel is effectively prevented from objecting as any objection would have 'fallen on deaf ears.' " *People v. Hanson*, 238 Ill. 2d 74, 118 (2010) (quoting *People v. McLaurin*, 235 Ill.2d 478, 488 (2009)).

¶ 46    Here, after the court read the incorrect instruction to the jury, the court immediately attempted to correct the instruction to ensure the jury received the correct instruction. Thereafter, when the jury was not in the courtroom, the court clarified with the parties what had happened when it read the jury instruction for AHC, thus providing an opportunity for defense counsel to object outside the presence of the jury. Defendant did not object. Accordingly, given these circumstances, we cannot find that the court overstepped its authority in the presence of the jury or that counsel was effectively prevented from objecting. Thus, the *Sprinkle* doctrine does not apply here, and we will not relax the forfeiture rule.

¶ 47    Defendant next argues that, even if his counsel was required to object to the trial court's instructions in order to preserve the jury instruction challenge for review, we should review the issue as a substantial defect under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) or for plain error. Generally, when a defendant does not object to a jury instruction and does not raise the issue in a posttrial motion, he forfeits review of any alleged jury instruction error. *Piatkowski*,

225 Ill. 2d at 564. "This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction." *Id*.

¶ 48   However, under Rule 451(c) "substantial defects" in jury instructions are not forfeited by failing to make a timely objection "if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). Rule 651(c) is coextensive with the plain error doctrine. *Piatkowski*, 225 Ill. 2d at 564. As previously discussed, under the plain error doctrine, we will review unpreserved error if "the evidence is so closely balanced that error alone threatened to tip the scales of justice against the defendant" or the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 40. Defendant has the burden of persuasion on both prongs. *People v. Green*, 2017 IL App (1st) 152513, ¶ 60. Before we apply the plain error doctrine, we must first determine whether any error occurred at all. *Nicholas*, 218 Ill. 2d at 121.

¶ 49   Jury instructions should guide and assist the jury in deliberating and reaching a proper verdict. *Mitchell*, 2018 IL App (1st) 153355, ¶ 41. The instructions convey to the jury the applicable law (*People v. Brown*, 2015 IL App (1st) 131552, ¶ 42) and "should not be misleading or confusing" (*People v. Bannister*, 232 Ill. 2d 52, 81 (2008)). The correctness of jury instructions "depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them." *Mitchell*, 2018 IL App (1st) 153355, ¶ 41. The trial court has the burden to make sure "the jury is properly instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." *People v. Sanders,* 129 Ill. App. 3d 552, 563 (1984). The failure to instruct the jury on

these three concepts deprives a defendant of a fair and impartial trial. *People v. Williams*, 2017 IL App (1st) 142733, ¶ 50. We review jury instructions as a whole and in consideration of the overall charge. *Bannister*, 232 Ill. 2d at 86. We "must determine whether the instructions fairly, fully, and comprehensively advised the jury of the relevant legal principles." *Mitchell*, 2018 IL App (1st) 153355, ¶ 41. The issue of whether the jury instructions conveyed the applicable law is reviewed *de novo*. *Id.*

¶ 50    Here, the trial court's oral jury instruction regarding the burden of proof for AHC was incorrect. The trial court instructed the jury on the offense of AHC as follows:

"To sustain the charge of armed habitual criminal, the State must prove the following propositions:

First, that the Defendant possessed any firearm; and

Second, that the Defendant had previously been convicted of two qualifying offenses.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.

If you find from your consideration of all the evidence that *each* one of these propositions has not been proved beyond a reasonable doubt or that *any* of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty." (Emphasis added.)

Because the court used the word "each" in the last paragraph in the instruction above, the jury was incorrectly instructed that it could find defendant not guilty of AHC only if the State failed to prove

*all* of the propositions. See *People v. Johnson*, 254 Ill. App. 3d 74, 78 (1993) (the court concluded that the instruction stating that the jury should find the defendant not guilty if it found that "each" one of the propositions had not been proved was incorrect, noting that the jury was instructed that it could find him not guilty "only if it found that the State failed to prove *all* of the propositions instead of *any* one of the propositions"). Thus, because the State must prove every essential element beyond a reasonable doubt, the court incorrectly instructed the jury that it could find defendant not guilty of AHC only if the State failed to prove all the propositions. See *Id*.

¶ 51    Having found that the instruction on the burden of proof for AHC was incorrect, we must determine whether the error rises to the level of plain error. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 86 (reviewing whether the jury instruction error rose to the level of plain error under the plain error doctrine).

¶ 52    Defendant's challenge fails under the first prong of the plain error doctrine because the evidence was not closely balanced. To determine whether the evidence was closely balanced, we must review the totality of the evidence and conduct a qualitative, commonsense assessment of the evidence within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. Our analysis involves an assessment of the evidence on the elements of the charged offense, along with any evidence regarding the credibility of the witnesses. *Id.* A defendant must show that the evidence at trial was so closely balanced that the "error alone tipped the scales toward a guilty verdict." *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 49. It is a defendant's burden to show that the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at 567.

¶ 53    Defendant was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2014)) and AHC (720 ILCS 5/24-1.7(a) (West 2014)). We note that defendant only

challenges the jury instruction for AHC and does not raise any issues with the jury instruction for aggravated discharge of a firearm. Defendant requests that we reverse his "conviction" and remand for a new trial. Although it is not entirely clear whether defendant is challenging both of his convictions based on the incorrect jury instruction for AHC, the evidence was not closely balanced for either conviction.

¶ 54 To prove defendant guilty of aggravated discharge of a firearm, the State had to prove that defendant knowingly or intentionally discharged a firearm at or into a building that he knew or reasonably should have known to be occupied and that he did so from a place or position outside that building. 720 ILCS 5/24-1.2(a)(1) (West 2014). To prove defendant guilty of AHC, the State had to prove that he possessed a firearm and had convictions for two or more qualifying offenses. 720 ILCS 5/24-1.7(a) (West 2014)

¶ 55 We find that the evidence was not closely balanced such that the incorrect jury instruction for AHC alone tipped the scales toward guilty verdicts for aggravated discharge of a firearm or AHC. At trial, the State presented evidence of two eyewitness detectives who identified defendant as the shooter at trial. Korolis testified that, at about midnight on the night of the shooting, he saw defendant shooting a firearm into a building. When he was pursuing defendant, he saw defendant swinging a handgun with his right hand. Similarly, Gillespie testified that, at about midnight on the night of the shooting, he saw defendant shooting a handgun at a residential building. When he pursued defendant, he saw defendant swinging a handgun in his right hand. Neither detective lost sight of defendant during the chase.

¶ 56 The detectives testimonies were corroborated by defendant's statement to the ASA, in which he admitted that he "purchased the gun" earlier that day, "was ordered" to shoot at the

building, and that his "intention was to bust out the window." Further, the eyewitness testimony from the detectives and defendant's admission were corroborated by the physical evidence. The forensic scientist testified that, after performing his analysis on the GSR evidence, he concluded that defendant's right hand either discharged a firearm, handled a firearm, or was in close proximity to a firearm when it was discharged.

¶ 57    Further, Korolis saw defendant toss the handgun and, after the detectives arrested defendant, both detectives saw the handgun defendant had been carrying in the nearby backyard. The evidence technician recovered that handgun, six spent shell casings, and a bullet from the windowsill of the residence that the detectives saw defendant shooting into. The parties stipulated that the recovered shell casings and metal bullet fragment were fired from the recovered firearm. Accordingly, given the eyewitness testimony from the detectives that was corroborated by the physical evidence and defendant's admission, we cannot find that the evidence was closely balanced.

¶ 58    Defendant argues that the evidence was closely balanced because defendant testified as to a different version of events than the detectives and the case was a credibility contest between the detectives and defendant. It was the jury's responsibility to assess the credibility of the witnesses and determine the appropriate weight of the testimony. See *People v. Evans*, 209 Ill. 2d 194, 211 (2004). The jury heard both versions of events and, based on the jury's guilty finding, the jury necessarily found the detectives' version credible. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 52. Further, as previously discussed, there was additional evidence corroborating the detectives' testimony and contradicting defendant's version. But see *People v. Naylor*, 229 Ill. 2d 584, 608 (2008) (finding that the evidence was closely balanced, where credibility was the only

basis upon which the defendant's guilt or innocence was decided and there was no additional evidence "to contradict or corroborate either version of events"). Accordingly, we are unpersuaded by defendant's argument that the evidence was closely balanced because this case involved a credibility contest between the two detectives and defendant.

¶ 59    Defendant's challenge also fails under the second prong of the plain error doctrine because the error did not affect the fairness of defendant's trial or challenge the integrity of the judicial process. From our review of the entire record, the court properly conveyed the appliable law and the jury was not confused or misled on the burden of proof or on what the State had to prove to convict defendant of AHC.

¶ 60    The State had to prove two elements for AHC: (1) defendant possessed a firearm and (2) he had previously been convicted of two qualifying felony offenses. For the second element, the parties entered a stipulation that defendant had two qualifying convictions. Thus, only one element — whether defendant possessed a firearm — was in controversy and the jury only had to consider that element. Because there was only one element in controversy, had the court only instructed the jury that it should find defendant not guilty if "any" of the elements were insufficient rather than also using the word "each" in the same instruction, the result would have been the same. See *Johnson*, 254 Ill. App. 3d at 79 (where the instruction stated that the jury should find the defendant not guilty only if "both" elements were insufficient, the court stated that only one of the two elements was in controversy and concluded that "[t]he result was no different than if the instruction had correctly said the jury should find the defendant not guilty if 'any' of the elements was lacking"). Further, defendant asserts that the court gave the jury contradictory and confusing instructions because it corrected the instruction on the burden of proof after it had read the incorrect

instruction. However, because there was only one element in controversy, any reading of the court's instruction on the burden of proof for AHC required the jury to convict only if it found that defendant possessed a gun. See *id.* (where only one element was in controversy and the court incorrectly instructed the jury on the burden of proof, the reviewing court found there "was no possible confusion as to what the jurors were being required to find," noting "any reading of the charge would command the jury to convict" only if it found the element in controversy had been met).

¶ 61 Moreover, the court properly informed the jury on the presumption of innocence and correctly instructed the jury that the State had the burden of proving defendant's guilt beyond a reasonable doubt. Further, during the State's closing argument, it correctly explained the two elements that were required for defendant to be guilty of AHC, as it expressly told the jury that a person committed AHC "[1]when he possesses any firearm [2] after having been convicted of two qualifying felony offenses." See *id* at 80-81 (finding the jury was competently instructed even though the court gave the jury an incorrect instruction, noting that the court properly instructed the jury as to the presumption of innocence and that the State had to prove every element beyond a reasonable doubt, which was "echoed" by the prosecutor during argument to the jury). In addition, citing to the supplemental electronic record filed with this court, the State asserts in its response brief that the written instruction that was given to the jury was correct, as it reflected the "any" language. In defendant's reply brief, he does not argue that the court's written instruction on the burden of proof for AHC that was sent back to the jury and that the jury had during its deliberations was incorrect. From our review, the electronic supplemental record shows that the written instructions stamped as filed by the clerk on March 25, 2015, the date the jury deliberated, properly

instructed the jury on the burden of proof for AHC. Thus, given the foregoing, including that the written instructions were correct, we do not find that the court's incorrect oral instruction misled the jury or that the jury was confused on what the State had to prove to convict defendant of AHC. See *People v. Darr*, 2018 IL App (3d) 150562, ¶¶ 84-85 (concluding that the court's incorrect jury instruction did not result in an unfair trial and that, when the jury instructions were considered as a whole, there was no possibility that the jury was confused, noting that the court corrected its misstatement both orally and in writing and the written instructions taken to the jury room were accurate).

¶ 62    Further, the court properly instructed the jury about the burden of proof for aggravated discharge of a firearm, which included the element that defendant knowingly discharged a firearm. Thus, in finding defendant guilty of aggravated discharge of a firearm, the jury necessarily found that he possessed a firearm beyond a reasonable doubt. Given this finding and that the parties stipulated that he had two qualifying felony convictions such that the element of possession was the only element in controversy, we cannot find that the incorrect jury instruction created a serious risk that the jurors incorrectly convicted him of AHC because they did not understand the applicable law.

¶ 63    Finally, defendant cites *People v. Sanders*, 129 Ill. App. 3d 552 (1984), to support his argument that the incorrect jury instruction denied him a fair trial. We find *Sanders* distinguishable. In *Sanders*, the defendant argued that the trial court committed reversible error in giving a jury instruction that misstated the burden of proof for attempted murder. *Sanders*, 129 Ill. App. 3d at 562. The trial court orally instructed the jury on the burden of proof as follows:

"If you find from your consideration of all the evidence that *any one* of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that *any one* of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis in original.) *Id*.

The written instructions changed the word "any" in the second paragraph to "each." *Id.* Thus, the jury was incorrectly instructed in both the oral and written instructions that the defendant could be convicted if only one of the two elements was proved. *Id.* The reviewing court concluded that the incorrect instructions on the burden of proof mandated reversal, noting that the oral and written instructions were not only individually incorrect but together presented conflicting and contradictory grounds by which a jury could find the defendant not guilty. *Id.* at 563.

¶ 64 Here, unlike *Sanders*, as previously discussed, the written instructions that the jury had in the jury room reflected the correct burden of proof for AHC. Further, in *Sanders* both elements were controverted but again, here, there was only one element in controversy. See *Johnson*, 254 Ill. App. 3d at 81 (there was only one element in controversy and *Sanders* was distinguishable because elements were controverted there).

¶ 65 Accordingly, from our review of the record as a whole, we find that the jury instructions fairly, fully, and comprehensively advised the jury of the correct and relevant legal principles and that the jury members, as ordinary persons, understood the instructions and were not confused by them. The incorrect instruction on the burden of proof for AHC therefore did not affect the fairness

of defendant's trial or challenge the integrity of the judicial process. Thus, defendant's challenge to the jury instruction fails under the second prong of the plain error analysis.

¶ 66 Defendant argues, in the alternative, that counsel was ineffective for failing to object to the court's incorrect jury instruction on the burden of proof for AHC. To prove counsel was ineffective, a defendant must show his counsel's performance was deficient and he was prejudiced by the deficient performance. *Temple*, 2014 IL App (1st) 111653, ¶ 53.

¶ 67 Defendant failed to establish prejudice. He cannot establish that, had trial counsel objected to the incorrect jury instruction regarding the burden of proof for AHC, the result of the trial would have been different. As previously discussed, because there was only one element in controversy, had counsel objected and the court only instructed the jury that it should find defendant not guilty if "any" of the elements were insufficient, the result would have been the same. See *Johnson*, 254 Ill. App. 3d at 79. Accordingly, defendant failed to prove that his counsel was ineffective for failing to object to the court's AHC jury instruction.

¶ 68 Defendant next contends that the trial court abused its discretion when it sentenced him to concurrent prison terms of 25 years for AHC and 25 years for aggravated discharge of a firearm. He asserts the court failed to consider the mitigation evidence and claims that his sentences were excessive and disproportionate given the nature of the offenses and the mitigation evidence. Defendant also contends that the court improperly relied on his prior convictions as aggravating factors because his prior convictions were either elements of the offense for AHC or were used to impose a class X sentence for aggravated discharge of a firearm.

¶ 69 Defendant acknowledges that he did not properly preserve his sentencing challenges because he did not raise the specific issues in his motion to reconsider sentence. *People v. Hillier*,

237 Ill. 2d 539, 544 (2010) ("To preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). However, we may review his challenge to his sentences under the plain error doctrine. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 11. As previously discussed, before we apply the plain error doctrine, defendant must first demonstrate that a clear or obvious error occurred. *Id.*

¶ 70 A trial court has broad discretionary powers when it imposes a sentence. *People v. Alexander,* 239 Ill. 2d 205, 212 (2010). On review, we give great deference to a trial court's sentencing decision because it is in a better position to consider the relevant sentencing factors. *Id.* The most important factor in sentencing is the seriousness of an offense. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. The trial court is in the best position to find an appropriate balance between protecting society and rehabilitating a defendant. *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). We will only modify a sentence if the trial court abused its discretion. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50. A trial court abuses its discretion when no reasonable person could agree with its position. *People v. Sven*, 365 Ill. App. 3d 226, 241 (2006). When a sentence falls within the prescribed statutory limit, we will not find that a court abused its discretion unless the sentence is "greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense." *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 71 AHC is a class X felony (720 ILCS 5/24-1.7(b) (West 2014)) with a sentencing range of 6 to 30 years in prison (730 ILCS 5/5-4.5-25(a) (West 2014)). Aggravated discharge of a firearm is a class 1 felony (720 ILCS 5/24-1.2(b) (West 2014)) with a sentencing range of 4 to 15 years in prison (730 ILCS 5/5-4.5-30(a) (West 2014)). However, because defendant had two prior felony convictions, the court sentenced defendant on the aggravated discharge of a firearm offense as a

class X offender (730 ILCS 5/5-4.5-95(b) (West 2014)), for which the sentencing range was 6 to 30 years. (730 ILCS 5/5-4.5-25(a) (West 2014)). Defendant's concurrent 25-year prison terms are well within the permissible statutory ranges. Thus, we will presume that the sentences are proper. See *Wilson*, 2016 IL App (1st) 141063, ¶ 12 (a sentence that falls within the statutory guidelines is presumed proper).

¶ 72  Nevertheless, defendant asserts that his sentences are excessive and disproportionate and that the court failed to consider the mitigation evidence, such as the hardship his incarceration would impose on his family, including his young son, and his struggle with substance abuse and anxiety.

¶ 73  When mitigation evidence is presented to the trial court, absent some indication to the contrary other than the sentence itself, we presume that the court considered it. *Sauseda,* 2016 IL App (1st) 140134, ¶ 19. When, as here, a defendant argues that the court failed to consider relevant factors, a defendant must make an affirmative showing that the court did not consider those factors. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. The relevant factors a trial court considers include the particular circumstances of the case as well as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Fern,* 189 Ill. 2d 48, 53 (1999). Other factors include the nature of the crime, the protection of the public, deterrence and punishment, and the defendant's rehabilitative prospects. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 14.

¶ 74  Defendant has not met his burden of affirmatively showing that the trial court failed to properly consider the relevant mitigating factors. When the court pronounced its sentence, it expressly stated that it reviewed defendant's educational, employment, and family histories,

including the fact that he had a young son. The court also expressly stated that it reviewed the presentence investigation report (PSI). The PSI contained information about mitigating factors, including his social, education, employment, financial, family, housing, health, psychological, and substance abuse/alcohol histories. Because the court expressly stated that it considered the PSI, we presume the court considered the relevant mitigating factors contained therein and his rehabilitation potential. See *Burton*, 2015 IL App (1st) 131600, ¶ 38 ("We presume the sentencing court considers mitigation evidence"); *People v. Babiarz*, 271 Ill. App. 3d 153, 164 (1995) (when the court examines a PSI, we presume it considered the defendant's potential for rehabilitation).

¶ 75    Further, at sentencing, defense counsel orally presented mitigating factors to the court, when he told the court that defendant had a history of substance abuse. Defense counsel also presented a letter from defendant's employer, an attendance sheet for Alcoholics Anonymous meetings, and a document defendant prepared showing the "thing's he grateful for." Again, we presume the court considered the mitigation evidence that defense counsel presented. Nothing in the record shows otherwise.

¶ 76    Defendant asserts his sentence is disproportionate because he was found guilty of shooting at a building, not a person, and there was no evidence that he harmed anyone. The seriousness of the offense is the most important factor at sentencing. *Wilson*, 2016 IL App (1st) 141063, ¶ 11. When the court sentenced defendant, it expressly stated that it considered the facts of the case and that the evidence against him was strong. The evidence showed that defendant stood on a residential street at midnight and shot into a residential building three or four times. He then fled from the police, swinging a gun while doing so. Although defendant did not cause any physical injuries that night, this conduct threatened serious harm to others. Given the evidence, we cannot

find that defendant's sentences vary greatly with the purpose and spirit of the law. We are unpersuaded by his argument that his sentences are excessive and disproportionate to the seriousness of the offenses.

¶ 77    Defendant claims that the only aggravating factor the court considered was his criminal history. When the court pronounced its sentences, it noted that defendant had a history of violent crimes and his history was "sufficient to warrant a severe punishment." However, the court also stated that it considered the facts of this case and reviewed the PSI. The court was not required to recite and assign value to each sentencing factor. *Bryant*, 2016 IL App (1st) 140421, ¶ 16. It was also not required to articulate the process it used to determine the appropriateness of defendant's sentence. See *People v. Wright*, 272 Ill. App. 3d 1033, 1046 (1995). We may not reweigh the sentencing factors or substitute our judgment for that of the trial court because we would have weighed the factors differently. *People v. Alexander*, 239 Ill. 2d at 214. The record indicates that the court properly weighed defendant's criminal history along with other relevant factors.

¶ 78    Defendant further contends that the court improperly relied on his prior convictions as aggravating factors. If a trial court considers an improper factor in aggravation, it abuses its discretion. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning." *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 14. It is a defendant's burden to affirmatively establish that the court's sentence was based on improper considerations. *People v. Dowding,* 388 Ill. App. 3d 936, 943 (2009). Our review of whether a trial court relied on an improper sentencing factor is *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. When sentencing a defendant, a trial court "may not consider a factor implicit in the offense as an aggravating factor." *Abdelhadi*, 2012 IL

App (2d) 111053, ¶ 9. "There is a general prohibition against the use of a single factor both as an element of a defendant's crime and as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed." *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992).

¶ 79   Here, when the court imposed sentence, it stated that defendant had a history of "violent" crimes, his "criminal history is sufficient to warrant a severe punishment when taking into consideration the allegations that *** he's been found guilty of already," and he "demonstrated himself to be a danger." The parties agree that defendant had four prior criminal convictions. With respect to his AHC conviction, two of his four convictions — aggravated domestic battery and home invasion — were used as predicate offenses. However, there is nothing in the record to show that the court improperly used these two convictions as a basis for imposing a harsher sentence for AHC. Rather, the record shows that the court considered defendant's entire criminal history, which included four convictions. See *People v. Brown*, 2018 IL App (1st) 160924, ¶ 21 (the court found that although the defendant's prior conviction was used as a predicate offense for his AHC conviction, the trial court could properly consider that prior conviction as part of his criminal history).

¶ 80   With respect to defendant's sentence for aggravated discharge of a firearm, even though he was subject to a class X sentencing range as a result of his prior convictions, the court could properly consider the same convictions it used to impose the class X sentence as part of his entire criminal history. See *People v. Thomas*, 171 Ill. 2d 207, 229 (1996) (a trial court's "use of prior convictions to impose a Class X sentence *** does not preclude the court from considering those same prior convictions as an aggravating factor").

¶ 81 The record shows that the court properly considered his criminal history in light of his likelihood to engage in future criminal activity and be a danger to society, as it stated that defendant had a history of "violent" crimes and had "demonstrated himself to be a danger." See *Morrow,* 2014 IL App (2d) 130718, ¶ 19 (affirming the defendant's sentence, noting that the "court's comments show that it was discussing the prior convictions in order to address defendant's likelihood to engage in criminal activity in the future, his inability to learn from prior punishments, the need for deterrence, and the protection of society"); *Thomas*, 171 Ill. 2d at 229 (The " 'second use' of defendant's prior convictions does not constitute an enhancement, because the discretionary act of a sentencing court in fashioning a particular sentence tailored to the needs of society and the defendant, within the available parameters, is a requisite part of every individualized sentencing determination."). Thus, the court did not improperly consider defendant's criminal history as an aggravating factor when it sentenced him.

¶ 82 In sum, defendant's sentences do not vary greatly with the purpose and spirit of the law and the court did not rely on an improper aggravating factor. The court therefore did not abuse its discretion when it imposed concurrent sentences of 25 years for AHC and 25 years for aggravated discharge of a firearm. There is therefore no sentencing error and defendant's sentencing challenges remain forfeited.

¶ 83 Defendant alternatively argues that trial counsel was ineffective for failing to fully preserve his sentencing challenges by raising his claims in his motion to reconsider sentence. However, an attorney is not considered ineffective for failing to file a motion that has no merit. *People v. Stewart*, 365 Ill. App. 3d 744, 750 (2006). As explained above, defendant's sentencing claims

would have been meritless. Thus, his counsel was not ineffective for failing to preserve his sentencing claims in his postsentencing motion.

¶ 84   Defendant next challenges the assessed fines and fees. He argues that he was improperly assessed the $5 court system assessment (55 ILCS 5/5-1101(a) (West 2014)) and that he is entitled to presentence custody credit to be applied toward the $15 State Police operations fee (705 ILCS 105/27.3a(1.5) (West 2014)), $50 court system fee (55 ILCS 5/5-1101(c) (West 2014), and $10 arrestee's medical costs fund assessment (730 ILCS 125/17 (West 2014)).

¶ 85   On February 26, 2019, while this appeal was pending, our supreme court adopted Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019). Rule 472 sets forth the procedure for correcting sentencing errors involving, as relevant here, "the imposition or calculation of fines, fees, assessments, or costs" and the "application of *per diem* credit against fines." Ill. S. Ct. R. 472 (a)(1), (2) (eff. Mar. 1, 2019). On May 17, 2019, while this appeal was still pending, our supreme court amended Rule 472, which stated that, "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). Rule 472 also states that "[n]o appeal may be taken by a party from a judgment of conviction on the ground of any sentencing error specified above unless such alleged error has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Accordingly, because this case was pending on March 1, 2019, under Rule 472, we must remand to the circuit court to allow defendant to file a motion pursuant to this rule.

¶ 86     We note that defendant asserts that under *People v. Barr*, 2019 IL App (1st) 163035, ¶ 6, we should reach the merits of his claims because the court there concluded that Rule 472 applied prospectively and defendant filed his appeal before the rule became effective on March 1, 2019. However, this court issued *Barr* on April 9, 2019, which was before the supreme court amended Rule 472 on May 17, 2019. We decline to reach the merits of his fines and fees challenge.

¶ 87     Finally, defendant contends that his postconviction petition stated an arguable claim that trial counsel was ineffective for failing to call Leyla Garcia as a witness. He claims that had counsel called Garcia as a witness, she would have impeached Brandon Watkins, as she would have testified that Watkins was in his backyard at the time of the shooting, not in his apartment as he testified. Defendant argues that Garcia's testimony on this issue would have established reasonable doubt that he knew or reasonably should have known that the building was occupied at the time of the shooting, which was an essential element for aggravated discharge of a firearm. Defendant also contends that counsel was ineffective for failing to impeach Gillespie with his testimony from the preliminary hearing about his pursuit of defendant.

¶ 88     Under the Post-Conviction Hearing Act, a defendant may attack a conviction by asserting that it resulted from a substantial denial of his or her constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2016); *People v. Tate*, 2012 IL 112214, ¶ 8. A postconviction action is not a direct appeal from a conviction but is a collateral attack on the judgment. *Id.* The postconviction petition process involves three stages. *Id.* ¶ 9.

¶ 89     At the first stage, as here, a *pro se* defendant need only present the "gist of a constitutional claim" in his petition. *People v. Edwards*, 197 Ill. 2d 249, 244 (2001). The trial court must summarily dismiss a first stage petition if it is "frivolous or patently without merit." 725 ILCS

5/122-2.1(a)(2) (West 2014). A petition is frivolous or patently without merit if it has no arguable basis in law or fact, *i.e.,* it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 11, 16 (2009). An indisputably meritless legal theory means that the theory is "completely contradicted by the record" and a fanciful factual allegation is "fantastic or delusional." *Id.* At the first stage, the allegations of fact are considered true unless they are affirmatively rebutted by the record. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47. Our review of a trial court's summary dismissal of a postconviction petition is *de novo*. *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 90    As previously discussed, to establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In the postconviction context, at the first stage, the court may not summarily dismiss a petition alleging ineffective assistance of counsel if "(1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result." *People v. Scott*, 2011 IL App (1st) 100122, ¶ 29. Because a defendant must prove both elements, we may review the prejudice prong first. *People v. Gray,* 2012 IL App (4th) 110455, ¶ 25. To establish prejudice, a defendant must show that there was a " 'reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.' " *People v. Miller*, 393 Ill. App. 3d 629, 632-33 (2009) (quoting *People v. Paleologos,* 345 Ill. App. 3d 700, 706 (2003)).

¶ 91    Defendant's petition is insufficient to show he was arguably prejudiced by counsel's alleged deficient performance because he cannot demonstrate that the result of the proceeding would have been different had counsel called Garcia as a witness. To support his petition,

- 36 -

defendant attached an affidavit from Garcia, which averred that, on October 27, 2012, at 11:15 p.m., which was the night after the shooting, she was with her friends "in the backyard on Springfield getting high off drugs and drinking." She averred that "the guy" in the police report "stayed back he was high and the place was his boyfriend basement apartment he was Never sleep and Everyone WAS OUTSIDE when the shooting happened the guy on the police Report lied about his story." Defendant claims that Garcia's affidavit shows that she could have provided exonerating testimony because she would have testified that Watkins was in the backyard at the time of the shooting, not inside the building.

¶ 92    To convict defendant of aggravated discharge of a firearm, as alleged here, the State had to prove that defendant knowingly or intentionally discharged "a firearm at or into a building he or she knows or *reasonably should know* to be occupied and the firearm is discharged from a place or position outside that building." (Emphasis added.) 720 ILCS 5/24-1.2(a)(1) (West 2014). Thus, the State had to prove that defendant reasonably should have known that the building was occupied, not that he knew Watkins or anyone else was inside. The evidence showed that, at around midnight on October 26, 2012, two detectives saw defendant, who was standing outside on a residential street, shoot a gun three or four times at a two-unit residential building. Watkins, who lived in that building, was in his bedroom watching television and, at about midnight that same night, heard a noise, after which he walked to the front of the house and saw bullet holes in the front window and kitchen and bathroom walls. Defendant admitted he "was ordered" to shoot at the building "because they were selling heroin out of that building." The evidence strongly indicated that the jury could have reasonably inferred that defendant reasonably should have known that someone was inside the building, regardless of whether Watkins was actually inside

or outside. Even if the jury would have believed Garcia's alleged testimony over Watkins's testimony on the issue of whether Watkins was in the backyard at the time of the shooting, we cannot find that her testimony would have changed the jury's guilty finding and necessary conclusion that he knew or reasonably should have known the building was occupied when he shot at it. Thus, because defendant cannot establish that the result of the trial would have been different had counsel called Garcia as a witness, he cannot establish that he was arguably prejudiced. Defendant therefore cannot establish an arguable claim that counsel was ineffective for failing to call Garcia as witness.

¶ 93    Defendant has also failed to establish that his postconviction petition stated an arguable claim that his counsel was ineffective for failing to impeach Gillespie with his testimony from the preliminary hearing. Defendant asserts that Gillespie's testimony at the preliminary hearing regarding his pursuit of defendant was inconsistent with his testimony at trial. Gillespie testified at the preliminary hearing that "the shooter turned around and pointed a gun at the detective during their pursuit," but testified at trial that "the shooter never turned around." He argues that counsel's performance was deficient for failing to impeach Gillespie with this testimony from the preliminary hearing and, had counsel done so, there is a reasonable probability that the jury would have concluded that the State's witnesses were not credible and found him not guilty.

¶ 94    As an initial matter, the State asserts that defendant forfeited his claim that counsel was ineffective for failing to impeach Gillespie with his testimony at the preliminary hearing. *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006) (if a claim is not raised in a petition, then it may not be raised for the first time on appeal). We agree that defendant's ineffective assistance argument is forfeited. Defendant asserted in his petition that Gillespie committed perjury, claiming that he

testified at the preliminary hearing that "[d]efendant was running turned on them with the [g]un and than [sic] threw it in a yard," but at trial testified that "[d]efendant was walking fast and tripped over something and he (did Not) see a Gun come out of his hand."

¶ 95 Defendant now asserts on appeal that counsel was ineffective for failing to impeach Gillespie with his inconsistent testimony at the preliminary hearing regarding whether defendant "turned around and pointed a gun" at him during the pursuit. However, in defendant's petition, he did not allege that counsel was ineffective for failing to impeach Gillespie on this issue. Even under the first-stage standard where we liberally construe defendant's petition, nonspecific and implicitly raised claims in a petition may not be raised on appeal. See *People v. Reed*, 2014 IL App (1st) 122610, ¶ 63 (concluding that the defendant's "nonspecific" ineffective assistance of counsel claim that was not "clearly set forth" in the petition was forfeited). Thus, defendant has forfeited his claim that counsel was ineffective for failing to impeach Gillespie with his allegedly inconsistent testimony.

¶ 96 However, even if we would assume that defendant's claim was not forfeited, we would still find that his claim fails because he cannot establish that the result of the trial would have been different had counsel impeached Gillespie with his testimony from the preliminary hearing. The evidence establishing defendant's guilt was overwhelming. As previously discussed, a second detective, Detective Korolis, also identified defendant in court and testified that he saw him shooting a firearm at a building. Korolis chased defendant and never lost sight of him. Korolis observed him swinging the gun with his right arm during the pursuit and subsequently saw him throw the gun over a fence. Defendant's admission corroborates Korolis's testimony, as he told the ASA that he purchased the gun earlier that day and was ordered to shoot at the building.

Moreover, the fired bullet recovered from the front window was fired from the recovered firearm and the forensic scientist concluded that defendant's right hand either discharged a firearm, handled a firearm, or was in close proximity to a firearm when it was discharged. Accordingly, given the overwhelming evidence establishing defendant's guilt, we cannot find that that the result of the proceeding would have been different had counsel impeached Gillespie with his allegedly inconsistent testimony from the preliminary hearing. Defendant has therefore failed to establish an arguable claim for ineffective assistance of counsel.

¶ 97    In sum, because defendant has not presented arguable claims for ineffective assistance of counsel, he has not presented the gist of a constitutional claim in his petition, and the court properly dismissed his petition as frivolous and patently without merit.

¶ 98    For the reasons explained above, we affirm defendant's convictions and the fines and fees issue is remanded to the circuit court pursuant to Rule 472(e).

¶ 99    Affirmed; remanded as to fines and fees.